# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **WARREN BROWN, Administrator, Estate of Alexa Brown,** <br> **153 Lynber Ln.** <br> **Clyde, OH 43410** <br><br> **and** | Case No.: <br><br> Judge <br><br> **COMPLAINT WITH JURY DEMAND** <br> **ENDORSED HEREON** |
| **STEVEN KELLER, Administrator, Estate of Kole Keller** <br> **710 Walnut Ridge Ln.** <br> **Sandusky, OH 44870** <br><br> **and** | Charles E. Boyk (0000494) <br> Michael A. Bruno (0033780) <br> Charles E. Boyk Law Offices, LLC <br> 405 Madison Ave., Suite 1200 <br> Toledo, Ohio 43604 <br> Telephone: (419) 241-1395 <br> Facsimile: (419) 241-8731 <br> email: cboyk@charlesboyk-law.com |
| **TRINA DONNERSBACH, Administrator, Estate of Shilah Donnersbach, and as next friend of Nolan Donnersbach, a minor,** <br> **115 S. Mulberry St.** <br> **Clyde, OH 43410** <br><br> **and** | Alan W. Mortensen (to be admitted pro hac vice) <br> Dustin Lance (to be admitted pro hac vice) <br> DEWSNUP, KING & OLSEN <br> 36 South State Street, Suite 2400 <br> Salt Lake City, Utah  84111 <br> Telephone:  (801) 533-0400 <br> Facsimile:  (801) 363-4218 <br> email:  amort@dkolaw.com |
| **CINDA McGILTON, Administrator, Estate of Jacob James Andrews,** <br> **118 Liberty St.** <br> **Clyde, OH 43410** <br><br> **and** | Attorneys for Plaintiffs |

TERESA A. BRUGGEMAN, individually )
and as mother of Christina Lagrou )
226 Herbster Street )
Fremont, OH  43420 )
)
)
and )
)
DAVID AND DONNA HISEY, as parents )
and next friends of Tanner Hisey, a )
minor, )
7959 State Route 101 N )
Clyde, Ohio 43410-9618 )
)
)
and )
)
)
TYLER HISEY SMITH, individually, )
7959 State Route 101 N )
Clyde, Ohio 43410-9618 )
)
)
and )
)
ROBERT AND KATHLEEN CASTER, as )
parents and next friends of Austin )
Caster, a minor, )
3524 E CR 113 )
Green Springs, OH 44836 )
)
)
and )
)
KATHLEEN CASTER, individually )
3524 E CR 113 )
Green Springs, OH 44836 )
)
)
and )
)
ROBERT CASTER, individually )
3524 E CR 113 )
Green Springs, OH 44836 )
)
)
and )
)
)
JEREMY LUNSFORD, as parent and next )
friend of MariAnna Lunsford, a minor )
134 Hobson Street )
Bellevue, OH  44811 )
)
)

and )
)
BRIAN AND ANGIE McGRADY,  as parents )
and next friends of Breanna McGrady )
and Sage McGrady, minors )
723 Race Street )
Clyde, Ohio 43410 )
)
and )
)
SHERRI WALDEN, individually )
662 W Madison St. )
Gibsonburg, OH 43431 )
)
and )
)
DIANE WEIKER, individually )
1865 CR 181 )
Green Springs, OH 44836 )
)
and )
)
MARK WEIKER, individually )
1865 CR 181 )
Green Springs, OH 44836 )
)
and )
)
DUSTIN WEIKER, individually )
1865 CR 181 )
Green Springs, OH 44836 )
)
and )
)
BRIAN WEIKER, individually )
1865 CR 181 )
Green Springs, OH 44836 )
)
and )
)
JOYCE WEIKER, individually and CARLOS )
WEIKER, individually )
1897 CR 181 )
Green Springs, OH 44836 )
)
and )

3

PHOEBE PINION, individually and TEDDY )
J. PINION, individually )
1875 CR 181 )
Green Springs, Ohio  44836 )
)
and )
)
NORMA MEADE, individually and GARY )
MEADE, indivdually )
1412 Coe Ave. )
Clyde, OH 43410 )
)
and )
)
JAMI BETTINGER, individually and )
DAVID BETTINGER, individually )
436 North Broadway )
Green Springs, OH  44836 )
)
and )
)
LARRY L. ROSS, JR., individually )
234 West Perry Street )
Green Springs, OH  44836 )
)
and )
)
HERBERT LEE and RENEE FARLEY, )
1876 CR 187 )
Green Springs, OH  44836 )
)
and )
)
CARLOS WEIKER, individually and on )
behalf of a Weiker family trust that owns )
real property, )
1897 CR 181 )
Green Springs, OH 44836 )
)
PLAINTIFFS, )
)
)
v. )

**WHIRLPOOL CORPORATION, a Delaware**
**Corporation**
**c/o CSC-Lawyers Incorporating Services**
**(Corporation Service Company),**
**Statutory Agent**
**50 West Broad Street, Suite 1800**
**Columbus, Ohio  43215**

**and**

**JOHN DOES I-X**
**Names and Addresses Unknown**

     **Defendants.**

The Plaintiffs, by and through counsel, allege as follows:

## THE PARTIES

## CHILDHOOD CANCER CLUSTER

1. The plaintiff Warren Brown is a resident of Clyde, Ohio, as was his daughter Alexa Brown, over whose estate he has been appointed Administrator.  He brings this wrongful death action as personal representative for the exclusive benefit of the surviving parents and other next of kin of Alexa Brown.

2. The plaintiff Steven Keller is a resident of Margaretta, Ohio, but at all relative times was a resident of Clyde, Ohio, as was his son Kole Keller, over whose estate he has been appointed Administrator.  He brings this wrongful death action as personal representative for the exclusive benefit of the surviving parents and other next of kin of Kole Keller.

3. The plaintiff Trina Donnersbach is a resident of Clyde, Ohio, as was her daughter Shilah Donnersbach, over whose estate she has been appointed Administrator.  She brings this wrongful death action as personal representative for the exclusive benefit of the

surviving parents, surviving minor child of Shilah and other next of kin of Shilah Donnersbach.

4.    The plaintiff Cinda McGilton is a resident of Clyde, Ohio, as was her son, Jacob James Andrews, over whose estate she has been appointed Administrator.  She brings this wrongful death action as personal representative for the exclusive benefit of the surviving parents, and other next of kin of Jacob James Andrews.

5.    The plaintiff Teresa Bruggeman is the surviving mother of Christina Lagrou and brings this action to assure that she, and her grandchild, the child of Christina Lagrou, are adequately represented and appropriate damages sought.

6.    The plaintiffs David and Donna Hisey are residents of Clyde, Ohio, as is their son, Tanner Hisey, a minor, for whom they bring this action.

7.    Tyler Hisey is a resident of Clyde, Ohio and grew up and was raised in Clyde, Ohio.

8.    The plaintiffs Robert and Kathleen Caster are residents of Clyde, Ohio, as is their son, Austin Caster, a minor, for whom they bring this action.

9.    Plaintiff Kathleen Caster is a resident of Clyde, Ohio and grew up and was raised in Clyde, Ohio, as is her husband Robert Caster.

10.    Plaintiff Jeremy Lunsford is a resident of Bellevue, Ohio, as is his daughter MariAnna Lunsfor, a minor, for whom he brings this action.

11.    The plaintiffs Brian and Angie McGrady are residents of Clyde, Ohio, as are their children Sage McGrady and Breanna McGrady, minors, for whom they bring this action.

## **WHIRLPOOL PARK HEALTH CLUSTER**

12.    Plaintiff Sherri Walden is a resident of Gibsonburg, Ohio and lived for several years to the direct north of the Whirlpool Park in Green Springs, Ohio.

6

13.  Plaintiff Diane Weiker is the wife of Mark Weiker and is the mother of Dustin Weiker, and Brian Weiker, and is a resident of Seneca County, Ohio and lives on property that abuts the south boundary of Whirlpool Park.

14.  Plaintiff Mark Weiker is the husband of Diane Weiker and a resident of Seneca County, Ohio and lives on property that abuts the south boundary of Whirlpool Park.

15.  Plaintiff Dustin Weiker is a resident of Seneca County and lives on property that abuts the south boundary of Whirlpool Park.

16.  Plaintiff Brian Weiker is a resident of Seneca County and lives on property that abuts the south boundary of Whirlpool Park.

17.  Plaintiff Joyce Weiker is the spouse of Carlos Weiker who are residents of Seneca County and live on property that abuts the south boundary of Whirlpool Park.

18.  Plaintiff Phoebee Pinion is the spouse of Teddy J. Pinion who are residents of Seneca County and live on property that abuts the south boundary of Whirlpool Park.

19.  Plaintiff Norma Meade and Gary Meade are residents of Clyde, Ohio and lived for several years to the direct west of the property that abuts the Whirlpool Park.

20.  Plaintiff Jami Bettinger and David Bettinger are residents of Green Springs, Ohio and live on property that is south of the Whirlpool Park.

21.  Plaintiff Larry L. Ross, Jr. is a resident of Green Springs, Ohio, and lives on property that is south of Whirlpool Park.

## PROPERTY DAMAGE PLAINTIFFS

22.  Apart from all of the above named plaintiffs who have property damage as alleged below, Plaintiff Carlos Weiker owns property that abuts the Whirlpool Park to the south.

23. Plaintiffs Herbert and Renee Farley own property that was once owned by Sherri Walden that is directly north and abuts the Whirlpool Park.

**DEFENDANTS**

24. The defendant Whirlpool Corporation is a corporation or other business entity organized and existing under the laws of the State of Delaware having its principal place of business in the State of Michigan.

25. The John Doe Defendants are potential parties to this action who have not yet been identified, whose names and address are currently unknown to Plaintiffs, despite due diligence, and who may be liable to Plaintiffs.

**JURISDICTION AND VENUE**

26. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

27. This Court has jurisdiction with respect to the claims set forth herein pursuant to 28 U.S.C. § 1332, in that diversity exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

28. Venue is proper as to this District and Division under 28 U.S.C. § 1391 (a) in that a substantial part of the event giving rise to this claim occurred within a county or counties in this District. The John Doe Defendants are potential parties to this action who have not yet been identified, whose names and address are currently unknown to Plaintiffs, despite due diligence, and who may be liable to Plaintiffs.

**GENERAL ALLEGATIONS**

29. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

30. Since 1954, Whirlpool has operated an appliance manufacturing facility in Clyde, Ohio (the "Clyde plant").

31. Since the time Whirlpool began operating the Clyde plant, appliance porcelain coating residuals and other waste products were trucked and disposed on several dumping sites across Eastern Sandusky County, including the above referenced dumping sites.

32. Once such dumping became illegal, Whirlpool began to dump such waste products on its own property, a property that was operated by Whirlpool as a park for its employees, its employees' families and the general population.

33. To cover such dumping materials, Whirlpool began to place park equipment over the sludge, building concrete basketball courts, concrete tennis courts and even a concrete pool.

34. Because of the unavailability to dump such sludge, Whirlpool began to burn such materials into the atmosphere, causing a residual benzaldehyde to blanket the entire Clyde area.

35. Beginning in 2006, citizens of Clyde, Ohio began to notice an unusually high incident rate of cancer amongst their children.

36. In April 2007, the Sandusky County Health Department (SCHD) and the Ohio Department of Health (ODH) completed an analysis of cancer incidence among childhood residents (ages 0-19) of the City of Clyde and Green Creek Township, by anatomical site/type of cancer, for the years 1996-2006 and 2002-2006.

37. This assessment revealed higher than expected numbers of childhood cancers for the 11-year time period from 1996-2006 and the more recent five-year period from 2002-2006.

38. Children are much more susceptible to toxins, even from the time before birth.

39. After birth, the physiology and behaviors of children increase their exposures to environmental toxins. Children consume more food and water per body weight and they have higher surface area to volume ratios than adults. The rapid development of children makes them more susceptible to damage from absorbed pollutants.

40. Children are especially susceptible to the effects of toxic exposure due to their permeable blood-brain barrier.

41. Children are also more susceptible to air pollution because their immune systems and lungs are not fully developed, as they have only 24 million alveoli at birth as compared to 257 million as adults.

42. In December 2007, Ohio Environmental Protection Agency (Ohio EPA) was contacted by SCHD and asked to attend a meeting with the families affected by childhood cancer to aid ODH in answering questions regarding potential environmental exposures and how they relate to cancer. Ohio EPA attended this meeting in January 2008.

43. Ohio EPA subsequently met with affected families in order to further discuss the environmental conditions in their community.

44. In 2008, Ohio EPA began to conduct environmental surveillance in the community, and began to conduct a detailed review of file information on historical releases, dumps/landfills and ongoing operations of area businesses. In January 2009, Ohio EPA began additional air and drinking water monitoring in the area.

45. During this time, ODH also conducted a spatial (geographic) analysis to identify areas of Sandusky County where clustering of childhood cancers is most likely to occur.

46.    The Comprehensive Cancer Center and James Cancer Hospital and Solve Research Institute at Ohio State University began an investigation of the Clyde Childhood Cancer Study.

47.    On May 29, 2009, the Ohio Cancer Incidence Surveillance System and the Comprehensive Cancer Program completed the Ohio Department of Health Investigation of Potential Clustering of Invasive Cancers among Children, Adolescents and Young Adults in Sandusky County, Ohio, 1996-2006.

48.    The results of the Ohio Cancer Incidence Surveillance System and Comprehensive Cancer Program found a Childhood Cancer Spike in Clyde, Ohio.

49.    Surveillance System for the years 1996-2006 revealed that assessment cancer among residents of Clyde City and Green Creek Township, age 19 years and younger, found 10 new cases of cancer when only 5.32 would be expected based on national background cancer incidence rates.

50.    For the more recent years of 2002-2006, there were eight new cases in this population when only 2.47 would be expected.

51.    The Surveillance System demonstrated a childhood cancer clustering in the eastern/northeastern portion of Sandusky County, extending into southeastern Ottawa County.

52.    It further found that there was a 95% Statistical probability that cancer spike was related to an external source.

53.    In May 2009 ODH shared the results of the cluster analysis with the affected parents and the news media.

54. As the investigation continued, ODH, SCHD and Ohio EPA continued to utilize all the data and information available to them. ODH conducted radiation monitoring and the Ohio EPA conducted air monitoring and a biological and water quality survey, concluding that there was no common source of exposure to carcinogens common to all children affected in the cancer cluster.

55. Due to mounting political pressures, the United States EPA became involved in the investigation.

56. As part of its investigation, the USEPA set up a hot line for people to call with tips.

57. As a result of the information gathered by the USEPA, 14 former dump sites of defendant Whirlpool were identified.

58. On June 29, 2012, the USEPA released a report on testing it had done at the Whirlpool plant located in Clyde, Ohio.

59. The USEPA found PCBs above its respective U.S. EPA Regional Screening Level (RSL).

60. Arsenic was detected above the EPA RSL.

61. Dichloromethane was detected above EPA RSL.

62. On June 29, 2012, the USEPA released its Findings from the Golembiowski Dump Site located just outside of Clyde.

63. Soil sample results indicated that arsenic was present about the RSL in all of the soil samples.

64. On June 29, 2012, the USEPA released its Findings from the Clyde City Dump located just north of the defendant Whirlpool's Clyde facility.

65. Soil and ground water samples show levels above the EPA Screening Level for Arsenic, PCBs, Boron, Antimony, Cadmium, Cobalt, Iron, Lead and Manganese.

12

66. U.S. EPA does not expect to take any removal action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. 9601 et seq. at any of the sites investigated.

67. On September 28, 2012, the USEPA released its Site Assessment Report for the Whirlpool Park Site.

68. The Site Assessment Report found in places a 9.5 foot layer of mottled grayish-black sludge with petroleum odor by and under the basketball court.

69. Analytical results for all subsurface soil samples indicated at the Whirlpool Park that PCBs and total metals were present in the subsurface soils at levels exceeding the U.S. EPA RSLs for residential properties and exceeding the U.S EPA requirements for PCB spill cleanup.

70. Whirlpool has publically claimed that it did not know of the polluted soil at the park and that it must have been there when they bought the park.

71. Yet drawings on file in the Sandusky County Courthouse show that the basketball court, tennis courts and pool was built after Whirlpool bought the park.

72. Witnesses claim that dumping of toxic materials was occurring at the Whirlpool Park up through the 1990s and up to the time it was sold.

73. Barrels of liquid Teflon were recently found on the Weiker property in the Green Creek bed.

74. The USEPA turned additional testing of the Whirlpool property over to the OEPA and the current property owner.  That testing has yet to occur.

75. The Cancer Cluster families remained frustrated, not getting answers as to what was killing their children and making their children sick.

76. In March of 2013, the Cancer Cluster families retained an environmental engineer to do dust sampling in several homes in the City of Clyde.

77. This testing revealed benzaldehyde in every single home tested in levels that are about the USEPA RSL levels.  *See* Exhibit A to the complaint.

78. Benzaldehyde is used by Whirlpool in Clyde in its manufacturing process.

79. Benzaldehyde is a known carcinogen and mutagen.  *See* Exhibit B and C to the complaint.

80. PCBs are a known carcinogen.  *See* Exhibit D to the complaint.

81. Teflon is a known carcinogen. *See* Exhibit E to the complaint.

82. Alexa Brown died of a medulloblastoma, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

83. Kole Keller died of brain cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

84. Shilah Donnersbach died of brain cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

85. Christina Lagrou died of large cell lymphoma, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

86. Jacob James Andrews died of brain cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

87. Tanner Hisey developed T-Cell leukemia, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

88. Tyler Hisey developed AML leukemia, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

89. Austin Caster developed esthsioneuroblastoma, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

90. Kathleen Caster developed ependymoma, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Robert Caster and Austin Caster suffered the loss of normal consortium with Kathleen as a result of her illness.

91. Sage McGrady developed neutropenia which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

92. MariAna Lunsford developed Avelear Orbital Rhabdomyosarcoma which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

93. Breanna McGrady developed Crohn's Disease which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Brian and Angie McGrady suffered the loss of normal consortium with their children because of their illnesses

94.    Sherri Walden developed small cell lymphoma and breast cancer, which were caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

95.    Diane Weiker developed ovarian and breast cancer, which were caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Mark Weiker, Dustin Weiker and Brian Weiker suffered the loss of normal consortium with Kathleen as a result of her illness.

96.    Mark Weiker developed a low sperm count, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Diane Weiker, Dustin Weiker and Brian Weiker suffered the loss of normal consortium with Mark as a result of his illness.

97.    Dustin Weiker is mentally disabled, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Diane Weiker and Mark Weiker  suffered the loss of normal consortium with Dustin as a result of his illness.

98.    Brian Weiker is mentally disabled, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Diane Weiker and Mark Weiker suffered the loss of normal consortium with Brian as a result of his illness.

99.    Joyce Weiker developed breast cancer and ovarian cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Carlos Weiker suffered the loss of normal consortium with Joyce as a result of his illness.

100. Phoebe Pinion developed breast cancer and ovarian cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Teddy J. Pinion suffered the loss of normal consortium with Phoebe as a result of her illness.

101. Norma Meade developed breast cancer and uterus cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  Gary Meade suffered the loss of normal consortium with Norma as a result of her illness.

102. Jamie Bettinger developed breast cancer, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.  David Bettinger suffered the loss of normal consortium with Jamie as a result of her illness.

103. Larry L. Ross, Jr. developed renal cell carcinoma and chronic myelogenous leukemia, which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

104. All of the plaintiffs, and those similarly situated, have all lost significant property values which was caused by exposure to benzaldehyde, PCBs, Teflon, Arsenic, Dichloromethane and/or another toxin released or produced by the defendant Whirlpool.

**FIRST CLAIM FOR RELIEF**

**(Negligence Resulting In Wrongful Death of Childhood Cluster)**

105. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

17

106. Defendant Whirlpool owed duties to the plaintiffs to operate its manufacturing process, including the disposal of chemicals in such a manner that it would not cause injury to plaintiffs.

107. Defendant Whirlpool breached their duties of care owed to the Brown, Keller, Donnersbach, Bruggeman, and McGuilton plaintiffs, and those other community members similarly situated whom have lost children from cancer, by disposing of chemicals in a dangerous and negligent way so as to kill said plaintiffs' children and others similarly situated.

108. As a result of defendant Whirlpool, the Brown, Keller, Donnersbach, Bruggeman, McGilton and Lunsford plaintiffs, and those other similarly situated, have suffered the loss of support from the reasonably expected earning capacity of their children, the loss of services of their children, the loss of the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish.

109. The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs bring this action for the conscious pain and suffering of their children before they died.

**SECOND CLAIM FOR RELIEF**

**(Negligence Resulting in Personal Injury to**

**Childhood Cluster and Whirlpool Park Cluster)**

110. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

111.  Defendant Whirlpool owed duties to the survivor plaintiffs, and those similarly situated, to operate its manufacturing process, including the disposal of chemicals, in such a manner that it would not cause injury to plaintiffs and to those similarly situated as plaintiffs.

112.  Defendant breached their duties of care owed to and caused personal injury to the plaintiffs by disposing of chemicals in a dangerous and negligent way.

113.  As a direct and proximate result of Whirlpool's neglegince, the plaintiffs sustained serious permanent personal injuries, including cancers and mental disabilities which have required the surviving plaintiffs to undergo hospital and medical care; incurred hospital and medical care costs; incurred great pain, suffering, severe mental anguish, emotional distress, and loss of wages.  The plaintiffs' injuries are permanent in nature and will require future medical care, future medical care costs, and they will continue to endure great pain, suffering, mental anguish and emotional distress.  Further, the plaintiffs will incur future lost wages and a diminished future earning ability.

### THIRD CLAIM FOR RELIEF

### (Strict Liability Resulting in Personal Injury to

### Childhood Cluster and Whirlpool Park Cluster)

114.  Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

115.  Defendant Whirlpool owed duties to the plaintiffs, and those similarly situated, to operate its manufacturing process, including the disposal of chemicals in such a manner that it would not cause injury to plaintiffs, and to those similarly situated.

116. Defendant Whirlpool breached their duties of care owed to the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs by disposing of chemicals in a dangerous way so as to kill said plaintiffs' children and others similarly situated.

117. As a result of defendant Whirlpool, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs have suffered the loss of support from the reasonably expected earning capacity of their children, the loss of services of their children, the loss of the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish for which Whirlpool is strictly liable.

118. The Brown, Keller, Donnersbach, Bruggeman, and McGuilton plaintiffs also bring this claim on behalf of the estates of their children for the conscious pain and suffering of their children before they died.

119. As a direct and proximate result of Whirlpool's negligence, the survivor plaintiffs, and those similarly situated, sustained serious permanent personal injuries, including cancers and mental disabilities which have required the surviving plaintiffs to undergo hospital and medical care; incurred hospital and medical care costs; incurred great pain, suffering, severe mental anguish, emotional distress, and loss of wages.  The plaintiffs' injuries are permanent in nature and will require future medical care, future medical care costs, and they will continue to endure great pain, suffering, mental anguish and emotional distress. Further, the plaintiffs will incur future lost wages and a diminished future earning ability.

120. The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs bring this action for the conscious pain and suffering of their children before they died.

**FOURTH CLAIM FOR RELIEF**

**(Ultra-Hazardous Activity)**

121.  Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

122.  Defendant Whirlpool manufacturing process, including the disposal of chemicals, were ultra-hazardous activities.

123.  Defendant Whirlpool breached their duties of care in carrying out its ultra-hazardous activities that has resulted in harm to the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs, and those similarly situated, by disposing of chemicals in a ultra-hazardous way so as to kill said plaintiffs' children and others similarly situated.

124.  As a result of defendant Whirlpool's ultra-hazardous activities, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs have suffered the loss of support from the reasonably expected earning capacity of their child, the loss of services of their children, the loss of the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish for which Whirlpool is strictly liable.

125.  The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs bring this action for the conscious pain and suffering of their children before they died.

126.  As a direct and proximate result of Whirlpool's ultra-hazardous activities, the survivor plaintiffs, and those similarly situated, sustained serious permanent personal injuries, including cancers and mental disabilities which has required the surviving plaintiffs to undergo hospital and medical care; incurred hospital and medical care costs; incurred great

21

pain, suffering, severe mental anguish, emotional distress, and loss of wages. The plaintiffs' injuries are permanent in nature and will require future medical care, future medical care costs, and they will continue to endure great pain, suffering, mental anguish and emotional distress. Further, the survivor plaintiffs will incur future lost wages and a diminished future earning ability.

### FIFTH CLAIM FOR RELIEF

### (Trespass)

127. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

128. Defendant Whirlpool's manufacturing processes, including the disposal of chemicals, constituted a trespass on plaintiffs' property and to those similarly situated as the plaintiffs.

129. Defendant Whirlpool's trespasses have resulted in harm to the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs by killing said plaintiffs' children and others similarly situated.

130. As a result of defendant Whirlpool's trespasses, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs have suffered the loss of support from the reasonably expected earning capacity of their children, the loss of services of their children, the loss of the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish for which Whirlpool is strictly liable.

131. The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs bring this action for the conscious pain and suffering of their children before they died.

132.  As a direct and proximate result of Whirlpool's trespasses, the survivor plaintiffs, and those similarly situated as the survivor plaintiffs, sustained serious permanent personal injuries, including cancers and mental disabilities which has required the surviving plaintiffs to undergo hospital and medical care; incurred hospital and medical care costs; incurred great pain, suffering, severe mental anguish, emotional distress, and loss of wages.  The plaintiffs' injuries are permanent in nature and will require future medical care, future medical care costs, and they will continue to endure great pain, suffering, mental anguish and emotional distress.  Further, the survivor plaintiffs will incur future lost wages and a diminished future earning ability.

### SIXTH CLAIM FOR RELIEF

### (Continuing Nuisance)

133.  Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

134.  Defendant Whirlpool's manufacturing process, including the disposal of chemicals, constituted a continuing nuisance on plaintiffs' property and to those similarly situated as the plaintiffs.

135.  Defendant Whirlpool's continuing nuisance has resulted in harm to the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs by killing said plaintiffs' children and others similarly situated.

136.  As a result of defendant Whirlpool's continuing nuisance, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs have suffered the loss of support from the reasonably expected earning capacity of their children, the loss of services of their children, the loss of

23

the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish for which Whirlpool is strictly liable.

137. The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children, for the conscious pain and suffering of their children before they died.

138. As a direct and proximate result of Whirlpool's continuing nuisance, the survivor plaintiffs, and those similarly situated as the survivor plaintiffs, sustained serious permanent personal injuries, including cancers and mental disabilities which has required the surviving plaintiffs to undergo hospital and medical care; incurred hospital and medical care costs; incurred great pain, suffering, severe mental anguish, emotional distress, and loss of wages. The plaintiffs' injuries are permanent in nature and will require future medical care, future medical care costs, and they will continue to endure great pain, suffering, mental anguish and emotional distress. Further, the survivor plaintiffs will incur future lost wages and a diminished future earning ability.

## SEVENTH CLAIM FOR RELIEF

### (Wrongful Death from Reckless Conduct)

139. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

140. Defendant Whirlpool owed duties to the plaintiffs to operate its manufacturing process, including the disposal of chemicals in such a manner that it would not cause injury to plaintiffs.

141. Defendant Whirlpool recklessly breached their duties of care owed to the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs, and those other community members

similarly situated whom have lost children from cancer, by disposing of chemicals in a dangerous and negligent way so as to kill said plaintiffs' children and others similarly situated.

142. As a result of defendant Whirlpool's reckless conduct, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs, and those other similarly situated, have suffered the loss of support from the reasonably expected earning capacity of their child, the loss of services of their children, the loss of the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish

143. The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs bring this action for the conscious pain and suffering of their children before they died.

**EIGHTH CLAIM FOR RELIEF**

**(Reckless Conduct Causing Personal Injury)**

144. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

145. Defendant Whirlpool owed duties to the survivor plaintiffs, and those similarly situated, to operate its manufacturing process, including the disposal of chemicals, in such a manner that it would not cause injury to plaintiffs and to those similarly situated as plaintiffs.

146. Defendant recklessly breached their duties of care owed to cause personal injury to the plaintiffs by disposing of chemicals in a dangerous and reckless way.

147. As a direct and proximate result of Whirlpool's recklessness, the plaintiffs sustained serious permanent personal injuries, including cancers and mental disabilities which has required

the surviving plaintiffs to undergo hospital and medical care; incurred hospital and medical care costs; incurred great pain, suffering, severe mental anguish, emotional distress, and loss of wages.  The plaintiffs' injuries are permanent in nature and will require future medical care, future medical care costs, and they will continue to endure great pain, suffering, mental anguish and emotional distress.  Further, the plaintiffs will incur future lost wages and a diminished future earning ability.

## NINETH CLAIM FOR RELIEF

### (Wrongful Death from Fraudulent Conduct)

148.  Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

149.  The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children for the conscious pain and suffering of their children before they died.  Defendant Whirlpool owed duties to the survivor plaintiffs, and those similarly situated, to operate its manufacturing process, including the disposal of chemicals, in such a manner that it would not cause injury to plaintiffs and to those similarly situated as plaintiffs.

150.  Defendant Whirlpool has made a false statement of a material fact that it did not know of the presence of PCBs and other chemicals at the Whirlpool Park and in producing pollution into the air that was not revealed to the Ohio EPA and others.

151.  Whirlpool knew that the statements were untrue.  Whirlpool was dumping at its park up until the time it closed and was sold and was producing toxic levels of pollution into the air.

152.  Whirlpool intended to deceive the various governmental entities, the citizens of Clyde, the plaintiffs and others similarly situated.

153. The citizens of Clyde, the plaintiffs and other similarly situated justifiably relied upon Whirlpool's statements and representations.

154. As a result of Whirlpool's fraudulent conduct, the plaintiffs, and those similarly situated to them, suffered injury.

155. As a result of defendant Whirlpool's fraudulent conduct, the Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs, and those other similarly situated, have suffered the loss of support from the reasonably expected earning capacity of their children, the loss of services of their children, the loss of the society of their children, the loss of prospective inheritance to the decedents' heirs and mental anguish

**156.** The Brown, Keller, Donnersbach, Bruggeman, and McGilton plaintiffs also bring this claim on behalf of the estates of their children for the conscious pain and suffering of their children before they died.

**TENTH CLAIM FOR RELIEF**

**(Fraudulent Conduct Causing Personal Injury)**

157. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

158. Defendant Whirlpool owed duties to the survivor plaintiffs, and those similarly situated, to operate its manufacturing process, including the disposal of chemicals, in such a manner that it would not cause injury to plaintiffs and to those similarly situated as plaintiffs.

159. Defendant Whirlpool has made a false statement of a material fact that it did not know of the presence of PCBs and other chemicals at the Whirlpool Park and in producing pollution into the air that was not revealed to the Ohio EPA and others.

160. Whirlpool knew that the statements were untrue.  Whirlpool was dumping at its park up until the time it closed and was sold and was producing toxic levels of pollution into the air.

161. Whirlpool intended to deceive the various governmental entities, the citizens of Clyde, the plaintiffs and others similarly situated.

162. The citizens of Clyde, the plaintiffs and other similarly situated justifiably relied upon Whirlpool's statements and representations.

163. As a result of Whirlpool's fraudulent conduct, the plaintiffs, and those similarly situated to them, suffered injury.

**ELEVETH CLAIM FOR RELIEF**

**(Negligence Resulting In Loss of Property Values)**

164. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

165. Defendant Whirlpool owed duties to the plaintiffs, and others similarly situated, to operate its manufacturing process, including the disposal of chemicals in such a manner that it would not cause injury to plaintiffs' property or its property values.

166. Defendant Whirlpool breached their duties of care owed plaintiffs, and those other community members similarly situated, causing a significant loss of property values and stigma to the plaintiffs' property.

**TWELFTH CLAIM FOR RELIEF**

**(Strict Liability for Loss of Property Values)**

167. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

168.  Defendant Whirlpool owed duties to the plaintiffs, and others similarly situated, to operate its manufacturing process, including the disposal of chemicals in such a manner that it would not cause injury to plaintiffs' property or its property values.

169.  Defendant Whirlpool breached their duties of care owed plaintiffs, and those other community members similarly situated, causing a significant loss of property values and stigma to the plaintiffs' property, for which Whirlpool is strictly liable.

### THIRTEENTH CLAIM FOR RELIEF

### (Ultra-Hazardous Activities Causing Loss of Property Values)

170.  Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

171.  Defendant Whirlpool operated its manufacturing process, including the disposal of chemicals, in such a manner that it was ultra-hazardous and caused harm to plaintiffs' property or their property values.

172.  Defendant Whirlpool breached their duties of care owed plaintiffs, and those other community members similarly situated, by engaging in an ultra-hazardous activity, causing a significant loss of property values and stigma to the plaintiffs' property, for which Whirlpool is strictly liable.

### FOURTEENTH CLAIM FOR RELIEF

### (Trespass Causing Loss of Property Values)

173.  Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

29

174. Defendant Whirlpool operated its manufacturing process, including the disposal of chemicals, in such a manner that it was a trespass and caused harm to plaintiffs' property or their property values.

175. Defendant Whirlpool breached their duties of care owed plaintiffs, and those other community members similarly situated, by trespassing, causing a significant loss of property values and stigma to the plaintiffs' property, for which Whirlpool is strictly liable.

## FIFTEENTH CLAIM FOR RELIEF

### (Continuing Nuisance Causing Loss of Property Values)

176. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

177. Defendant Whirlpool operated its manufacturing process, including the disposal of chemicals, in such a manner that it was a continuing nuisance and caused harm to plaintiffs' property or their property values.

178. Defendant Whirlpool breached their duties of care owed plaintiffs, and those other community members similarly situated, by creating a continuing nuisance, causing a significant loss of property values and stigma to the plaintiffs' property, for which Whirlpool is strictly liable.

## SIXTEENTH CLAIM FOR RELIEF

### (Loss of Consortium)

179. Plaintiffs incorporate by reference the allegations contained in preceding paragraphs as though fully restated herein.

180. As a result of the above stated conduct, the spouses and children of many of the Cancer Survivors and those similarly situated have lost the normal marital and filial consortium.

## SEVENTEENTH CLAIM FOR RELIEF

### (Punitive Damages)

181. The actions of Whirlpool demonstrate a conscious disregard for the rights and safety of plaintiffs and the rest of the public.  As such, Plaintiffs demand punitive damages against the defendants.

### CLASS ACTION

182. Plaintiffs have brought this suit in their individual capacities.  However, plaintiffs also bring this as class action lawsuit brought by Plaintiffs and all other similarly situated residents of Ohio who have been affected either by losing a loved one to cancer, having cancer or losing property value because of the tortious conduct by Whirlpool described above.

183. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

184. Plaintiffs bring this suit on behalf of themselves and on behalf of all others similarly situated (the "Class") pursuant to FED. R. CIV. P. 23(a), 23(b)(2) and 23(b)(3).

185. Subject to additional information obtained through further investigation and/or discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. In particular, based on discovery to be obtained in this action, and based on consultations with expert witnesses, Plaintiff anticipates refining the Class definition to specify exactly which chemicals Whirlpool dumped or put into the air is causing the Cancer Clusters in Clyde, Ohio.

186. Plaintiff seeks to represent the following class: All current and former residents of Ohio who have gotten cancer or lost a love one to cancer caused by toxins discharged by Whirlpool and all citizens whose property values have been diminished because of Whirlpool's discharging toxins and dumping toxins in the Clyde/Green Spring's area and sending benzadehyde into the atmosphere.

187. This action has been brought and may be properly maintained as a class action for the following reasons:

A.  Numerosity:  Members of the Class are so numerous that their individual joinder is impracticable.  Plaintiffs are informed and believe and on that basis allege, that the proposed Class contains thousands and perhaps tens of thousands of members.  The precise number of Class members is currently unknown to Plaintiffs.

B.  Existence and predominance of Common Questions of Fact and Law:  Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

i.  Whether Whirlpool has been polluting against the law through its air discharges and dumping in Sandusky County;

ii.  Whether Plaintiffs and members of the Class have been injured as a result of Whirlpool's conduct as alleged herein, and, if so, the extent to which Plaintiffs and Class members are entitled to damages and/or other relief.

iii.  These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

32

c.  Typicality: Plaintiffs' claims are typical of the claims of the Class since Plaintiffs have either lost a child in the Childhood Cancer Cluster, had a sick child or been sick from cancer or have had their property values diminished because of  Whirlpool's conduct alleged above.  Plaintiffs and all members of the Class sustained monetary and non-economic injury arising out of Whirlpool's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and  all absent Class members.

d.  Adequacy: Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class that they seek  to represent.  Plaintiffs have retained counsel competent and highly experienced in complex class action litigation that has done significant dust and water sample testing in Clyde; and the intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by  Plaintiffs and their counsel.

e.  Superiority: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Further, individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By

contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

f.  Defendant has acted, and has refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

g.  In the absence of a class action, Defendant would be unjustly enriched because it would be able to retain the benefits and fruits of its wrongful conduct.

WHEREFORE, Plaintiffs pray that judgment be entered against the defendants in an amount in excess of $75,000.00 for all causes of action above or is an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs; the costs of cleaning the homes of those who have benzaldehyde dust, medical monitoring of members of the class who are not yet sick and punitive damages against Whirlpool; and other relief as justice requires or as this Court or the trier of fact sees fit under principles of law and equity, plus reasonable attorney fees, interest, and costs associated herewith.

Respectfully submitted

/s/ Charles E. Boyk
Charles E. Boyk
Alan W. Mortensen (to be admitted pro hace vice)
Dustin Lance (to be admitted pro hac vice)
Attorney for Plaintiffs

<u>JURY DEMAND</u>

Now come the Plaintiffs and demand a jury trial on all issues triable by right before a jury.

Respectfully submitted;

<u>/s/ Charles E. Boyk</u>
Charles E. Boyk
Attorney for Plaintiffs