**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Wendy Brown, et al.,                                              Case No. 3:13CV1092

               Plaintiffs

         v.                                                            **ORDER**

Whirlpool Corporation,

               Defendant

       This suit, brought under diversity jurisdiction and governed by Ohio law, has its origins in a well-documented cancer cluster in eastern Sandusky County, Ohio.

       Plaintiffs are fifty-eight Sandusky County residents who assert claims for wrongful death, personal injury, and property damage against defendant Whirlpool Corporation. They allege Whirlpool dumped toxic waste at sites near its manufacturing plant in Clyde, Ohio, and emitted pollutants, carcinogens, and volatile organic compounds (VOCs) into the air. Plaintiffs contend that, as a result of their exposure to those substances, they and/or their decedents developed cancer, disabilities, and other maladies.

       Now pending are Whirlpool's motion to dismiss for failure to state a claim (Doc. 33) and plaintiffs' motion to strike certain exhibits to Whirlpool's motion (Doc. 42). For the following reasons, I deny the motion to strike and grant in part and deny in part the motion to dismiss.

**Background**

### A. Emissions from the Clyde Plant

Since 1954, Whirlpool has manufactured appliances at its plant in Clyde, a city in the southeast corner of Sandusky County.

During the manufacturing process, Whirlpool applied a coat of paint to each piece of steel used to build appliances. Before September, 2005, Whirlpool used a two-dip protocol, which involved dipping steel twice into vats of paint. In September, 2005, Whirlpool switched to a single-dip protocol. However, the paint applied during that process did not adhere properly to the steel, resulting in steel that was unfit for use.

Thereafter, Whirlpool started using a new type of paint that, when combusted, "produced much greater air pollution with a much higher amount of volatile organic compounds (VOCs), some of which are known or suspected carcinogens." (Doc. 23 at ¶52). According to plaintiffs, the smoke stacks through which Whirlpool emitted the combusted paint were too short "to place the VOCs or other toxins at a level where [they] would not fall upon the city of Clyde." (*Id.* at ¶54).

According to plaintiffs, Whirlpool aggravated this emissions problem with its handling of steel parts coated with the non-adhering paint. Whirlpool employees took that steel to a "koline building where [they] would burn off the paint." (*Id.* at ¶55). The combusted paint would flow through the same smoke stacks that were too short to ensure that no VOCs fell onto Clyde. Plaintiffs also allege Whirlpool's smoke-stack system lacked regenerative thermal oxidizers.

In 2008, "long after Whirlpool stopped using the one dip system," the Ohio Environmental Protection Agency (Ohio EPA) began monitoring the air and drinking water in and around Clyde. (*Id.* at ¶70). Testing of the "ambient air emissions from the Whirlpool plant," in 2009 and 2010, "found unacceptable levels" of acetone, benzene, butane, butanone, chlorodfluoromethane,

2

dichlorodfluoromethane, hexmethylene chloride, pentane, and trichloroflouromethane." (*Id.* at ¶158).

In June, 2012, the United States Environmental Protection Agency (EPA) issued a report on testing it conducted at the Clyde plant. The EPA found polychlorinated biphenyls (PCBs) – a class of known carcinogens – and dichloromethane present in amounts exceeding the EPA's regional screening level (RSL). (*Id.* at ¶¶159-160).

In 2012 or 2013, plaintiffs retained Vanilla Environmental Partners to test air quality in Clyde. Vanilla collected dust samples from the attics of six homes in the area, tested them for heavy metals, VOCs, and other substances, and issued a report (the Vanilla Report).

Plaintiffs allege the Vanilla Report identified "a residual of benzaldehyde blanket[ing] the entire Clyde area." (Doc. 23 at ¶60). The Report itself, which plaintiffs attach to their complaint, does not refer to such a "blanket," but states benzaldehyde was detected in the attics of six homes in Clyde. While the Vanilla Report also noted that benzaldehyde "has not been well studied for human health effects" (Doc. 23-1 at 10),plaintiffs allege benzaldehyde is a suspected carcinogen, a mutagen, and a "marker" of carcinogens and VOCs previously released into the air. (*Id.* at ¶167).

Plaintiffs acknowledge that Whirlpool has denied using benzaldehyde in its "core manufacturing process." (Doc. 23 at ¶166). However, plaintiffs allege that: 1) Whirlpool refuses to define its core manufacturing process; and 2) on reasonable information and suspicion, benzaldehyde is a component of Whirlpool's core manufacturing process.

The Vanilla Report further determined no PCBs were present in the attic dust samples. And while some of those samples tested positive for heavy metals, there was no "identifiable pattern in the results." (*Id.*).

**B. Clyde Cancer Cluster**

In 2006, the citizens of Clyde noticed an unusually high incidence of cancer among their children. Both the Sandusky County Health Department (SDHC) and the Ohio Department of Health (ODH) analyzed the cancer rate and confirmed that it was higher than expected.

In May, 2009, ODH and the Ohio State University prepared a study entitled "Investigation of Potential Clustering of Invasive Cancers among Children, Adolescents[,] and Young Adults in Sandusky County, Ohio, 1996-2006." (Doc. 33-7 at 1).

The study confirmed a childhood cancer spike in Clyde. According to the study, the expected cancer rate in the United States for a population of 100,000 children is 32.2 children with cancer. The area in which the Clyde cancer spike was detected has a childhood population of 4,206, and the expected cancer rate among this population is 1.35 children with cancer. However, "[o]ver 43 children in Eastern Sandusky County have gotten cancer from 2000 to 2013." (Doc. 1 at ¶81).

Plaintiffs allege the ODH-OSU study found "there was a 95% Statistical probability that [the] cancer spike was related to an external source." (Doc. 23 at ¶83). The report contains no such finding,[1] though it did conclude "[t]he probability of observing these clusters due to chance alone was low." (Doc. 33-7 at 20).

---

[1] Whirlpool attached the study to its motion to dismiss. Because the study is a matter of public record, referred to in the complaint, and central to plaintiffs' allegations, I may consider it in evaluating the motion to dismiss. *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005). Because the report itself contradicts plaintiffs' representation of the study's conclusions, the study trumps the complaint. *Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 843 (N.D. Ohio 2010).

Plaintiffs' complaint also refers to another ODH investigation that found "no common source of exposure to carcinogens common to all children affected in the cancer cluster." (Doc. 23-1 at ¶85).

The ODH disclosed the results of its investigation with concerned citizens in May, 2009. Shortly thereafter, the EPA set up a tip line to receive information about Whirlpool's alleged connection to the cancer cluster. The tip line helped authorities identify fourteen locations within Sandusky County where Whirlpool allegedly dumped toxic manufacturing waste.

## C. Dump Sites

According to plaintiffs, Whirlpool hauled "appliance porcelain coating residuals, paints, solvents[,] and other waste products" from the Clyde plant and dumped that material at fourteen sites. (Doc. 23 at ¶89). The EPA studied twelve of those sites, and the complaint describes the EPA's findings at six sites.

During the 1960s, Whirlpool allegedly hauled daily shipments of sludge from the Clyde Plant to the Amert Lagoon, located on Clyde's west side. The EPA found:

- High concentrations of benzene, barium, arsenic, boron, and nickel, which allegedly "caused a cumulative cancer risk";

- Cobalt, iron, lead, and nickel present in the soil at levels exceeding the RSL for each substance;

- Lead in the water around Amert Lagoon at a level exceeding the National Primary Drinking Water Regulations maximum contaminant level (MCL);

- Antimony, arsenic, barium, and lead present in the groundwater and leachate at levels exceeding the relevant MCL; and

- VOCs, semi-volatile organic compounds, and arcolor 1254 PCBs in soil samples at levels exceeding the relevant RSLs.

(Doc. 23 at ¶¶95-96, 103-104).

5

Whirlpool also used trenches at the Amert Lagoon site to dispose of liquid waste. Some of these trenches abutted Racoon Creek and, during the EPA investigation, agents saw waste seeping from the west bank of the dumping grounds into the Creek.

In brief, the more pertinent results of EPA's testing at five other dump sites were:

| | Location | Dumping Operations | Soil Samples | Groundwater Samples |
|---|---|---|---|---|
| **Golembiowski Dump** | 1/2 mile west of Clyde and immediately south of Amert Lagoon<br><br>Surrounded by private residences | Since 1969, received wastewater sludge from the Clyde Plant | N/A | Boron: 2.6 mg/L |
| **Green Greek Dump** | Not specified | Witness reports indicate Whirlpool dumped for several years | PCB Arcolor 1254: 0.96 mg/kg<br><br>Benzo(a)anthra-cene: 0.19 mg/kg<br><br>Benzo(a)pyrene: 0.069 mg/kg<br><br>Lead: above NPDW maximum | N/A |
| **Leach Dump** | Rural/residential area roughly one mile west of Clyde | Wastewater sludge from the Clyde plant dumped onto ground | Thallium: 0.78 mg/kg<br><br>Benzo(a)pyrene: 0.015 mg/kg<br><br>PCB Arcolor 1254: 0.22 mg/kg | Boron: 62 mg/L |

| | | | | |
|---|---|---|---|---|
| **Shaw Road Dump** | Rural/residential area south of Clyde | Used as a dump for several years | Benzoprene, iron, lead, antimony, hexavalent, and chromium present "in unacceptable levels" | N/A |
| **McGrath Dump** | Rural/residential area 2.5 miles north of Clyde | Industrial solid and liquid wastes dumped on property from 1965 through 1968 | Levels of arsenic and iron above respective RSLs<br><br>SVOCs, including benzo(a)anthra-cene and benzo(a)-pyrene present above respective RSLs<br><br>Iron, lead, antimony, and chromium found "in unacceptable levels" | N/A |

Plaintiffs allege that the Whirlpool dump sites "have allowed many of the above pollutants, many of which are known human carcinogens . . . to blow through the wind or migrate to the water onto the citizens of Clyde and Eastern Sandusky County." (Doc. 23 at ¶140).

### D. Whirlpool Park

Whirlpool allegedly deposited "sludge materials," which plaintiffs allege was hazardous waste, on property in Green Springs, Ohio, that Whirlpool previously owned. At some point, while the property was still in Whirlpool's control, Whirlpool converted this property into a park for its employees, their families, and the general public. (*Id.* at ¶144).

EPA testing of soil samples from Whirlpool Park, as this property is called, established that: 1) PCBs in the sub-surface soil exceeded the relevant safety thresholds; and 2) "total metals were

7

present in the subsurface soil at levels exceeding the EPA's RSL for residential properties[.]" (*Id.* at ¶148).

In public statements, Whirlpool denied knowledge of the polluted soil at Whirlpool Park. However, plaintiffs allege that "drawings on file in the Sandusky County [c]ourt house show that the basketball court, tennis court, and pool were built after Whirlpool bought the park." (*Id.* at ¶149).

Plaintiffs note that, in August, 2013, the Ohio EPA started a new round of testing at Whirlpool Park.

### E. The Lawsuit

Plaintiffs assert seventeen claims against Whirlpool for negligence, strict liability/ultra-hazardous activities, reckless conduct, trespass, continuing nuisance, and fraud.

The fifty-eight plaintiffs fall into three groups. Plaintiffs in the first group – the Childhood Cancer Cluster plaintiffs – seek redress for the deaths of their children, who perished from various types of cancer after exposure to toxic substances emitted or dumped by Whirlpool.

Plaintiffs in the second group – the Whirlpool Park Health Cluster plaintiffs – live or used to live near Whirlpool Park. They contend that, as a result of their exposure to airborne pollutants and toxic sludge, they developed cancers, disabilities, and other diseases.

Plaintiffs in the third group – the Property Damage plaintiffs – seek compensation for an alleged decline in their property values, which they attribute to Whirlpool's emitting and dumping practices.

### Discussion

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). When reviewing a motion to dismiss, I construe the complaint in the light most favorable to the plaintiff and accept all well-pled allegations as true. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 501 (6th Cir. 2007).

The complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Although Rule 8 does not require detailed factual allegations, it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 814 (S.D. Ohio 2012). A plaintiff's obligation "to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007).

At bottom, the complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, *supra*, 556 U.S. at 678.

### A. Motion to Strike

Before considering the adequacy of the complaint, I must decide whether, and to what extent, I should grant plaintiffs' motion to strike exhibits two through ten to defendant's motion to dismiss. Those exhibits include reports by the EPA, the Ohio EPA, and ODH. The reports contain those agencies' findings with respect to, *inter alia*, the air quality in and around Clyde, possible causes of the childhood cancer cluster, and the toxicity of benzaldehyde.

Plaintiffs concede I have authority to take judicial notice of these documents, which are a matter of public record. (Doc. 42 at 2). They also agree I may do so without converting defendants'

motion to one for summary judgment. But plaintiffs argue Whirlpool relies on those documents for an impermissible purpose: namely, to contradict or dispute certain facts alleged in the complaint.

Whirlpool argues I should, in light of plaintiffs' concession, deny the motion as moot. It also asserts I can – and should – take judicial notice of its exhibits because the exhibits "are cited or selectively quoted in [the] Complaint and are integral to [plaintiffs'] claims." (Doc. 44 at 7).

In evaluating a motion to dismiss, a court generally cannot look beyond the complaint and attached exhibits. *E.g.*, *Blesedell v. Chillicothe Tel. Co.*, 2013 WL 6096329, *2 (S.D. Ohio). However, exhibits to a motion to dismiss are considered part of the pleadings if the plaintiff's complaint refers to those exhibits and the exhibits are central to plaintiff's claims. *Rondigo LLC v. Town of Richmond*, 641 F.3d 673, 680-681 (6th Cir. 2011).

Moreover, I may judicially notice matters of public record without converting a 12(b)(6) motion into a motion for summary judgment. *Wyser-Pratte*, *supra*, 413 F.3d at 560; *cf.* Fed. R. Civ. P. 12(c) (if court considers matters outside pleadings, it generally must convert motion to dismiss into one for summary judgment).

Given plaintiffs' concession that I have authority to take judicial notice of defendants' exhibits, and my conclusion that the exhibits are, at least to some extent, appropriate for judicial notice, I will deny the motion to strike.

That does not mean I will consider the exhibits for the purposes urged by Whirlpool.

"When considering public documents in the context of a motion to dismiss, [I] may not accept a document to decide facts that are in dispute." *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 713 (S.D. Ohio 2006). Furthermore, even when an exhibit is part of the pleadings,

"it is not always appropriate to assume everything in an exhibit is true." *Carrier Corp. V. Outokumpu Oyj*, 673 F.3d 430, 441 (6th Cir. 2012).

As the Sixth Circuit explained:

Although a blanket adoption rule makes sense in the context of an attached contract or loan agreement because the contract represents an agreement between two or more parties to which the law binds them, the rule makes much less sense when, as is the case here, the exhibit is not a legally dispositive document.

*Id.* at 442.

Here, my review of Whirlpool's motion to dismiss and its opposition to plaintiff's motion to strike leaves no doubt that Whirlpool would have me use its exhibits "not merely to prove [their] existence but rather to prove the truth of matters within them." *Id.*

For example, plaintiffs allege that, after testing in 2009 and 2010, the Ohio EPA detected "unacceptable levels" of various substances, including benzene, in "the ambient air emissions from the Whirlpool Plant." (Doc. 23 at ¶158).

Whirlpool calls that allegation into question by reference to its Exhibit 3, which details the Ohio EPA's findings regarding the quality of ambient air in Clyde generally. Notably, that study does not appear to have tested emissions from Whirlpool's Clyde plant itself. Nevertheless, Whirlpool argues Exhibit 3 "negate[s] Plaintiffs conclusory allegations that their illnesses were caused by exposure to toxins release or produced by Whirlpool." (Doc. 43 at 13).[2]

Considering Exhibit 3 for that purpose "would impermissibly allow [Whirlpool] to question the evidentiary foundation of [plaintiffs'] complaint, thereby depriving [plaintiffs] of the

---

[2] Whirlpool also argues that plaintiffs' failure to dispute or account for certain conclusions in the reports justifies dismissal of the complaint. These arguments may have merit should this case reach summary judgment, but they are presently premature.

11

presumption of truth to which [they are] entitled at this stage of the litigation." *Carrier Corp.*, *supra*, 673 F.3d at 442.

I am mindful of the tension between certain allegations in the complaint, which for present purposes I accept as true, and the findings in Whirlpool's exhibits, which call into question a fair number of plaintiffs' allegations. However, at this stage of the litigation plaintiffs can "draw facts from [those reports] to provide a starting point and then use those facts to construct a theory that differs from or even contradicts [the findings] of the [government agencies]." *Id.*

Therefore, unless otherwise noted, I will not consider the exhibits to Whirlpool's motion in evaluating whether the complaint states a plausible claim.

### B. Negligence Claims

Plaintiffs assert three negligence claims against Whirlpool.

In counts one and two, plaintiffs allege: 1) Whirlpool breached its duty to dispose of its manufacturing waste safely; and 2) that breach caused the deaths of five children and cancers and other diseases in other plaintiffs.

In count eleven, plaintiffs contend that Whirlpool's negligent handling of its chemical waste proximately caused "a significant loss of property values and stigma to the plaintiffs' property." (Doc. 23 at ¶271).

To state a negligence claim under Ohio law, plaintiffs must allege: 1) the existence of a legal duty; 2) the breach of that duty; and 3) harm proximately caused by the breach. *Mussivand v. Davis*, 45 Ohio St. 3d 314, 318 (1989).

When, as in this case, the defendant's negligence leads to an alleged release of toxic substances, the proximate cause element has two components: general causation and specific

causation. *Terry v. Caputo*, 115 Ohio St. 3d 351, 355 (2007). To satisfy the causation element, a plaintiff must show: "(1) that the toxin is capable of causing the medical condition or ailment"; and "(2) that the toxic substance in fact caused the claimant's medical condition[.]" *Id.*

There is no dispute that Whirlpool owed plaintiffs a duty of care, so I turn to whether the complaint adequately alleges a breach and proximate cause.

### 1. Breach

Whirlpool first argues that, to state a breach of duty, plaintiffs must allege "Whirlpool improperly disposed of or released one or more of the toxic substances" identified in the complaint. (Doc. 33-1 at 13). Plaintiffs have not done so, Whirlpool contends, because: 1) there is no basis to infer Whirlpool emitted benzaldehyde; 2) the allegations that Whirlpool emitted airborne pollutants are implausible; and 3) the allegations that Whirlpool disposed of manufacturing waste at multiple dumping grounds are "nonspecific." (*Id.* at 15).

Plaintiffs respond that they adequately allege Whirlpool breached its duty of care by releasing benzaldehyde, a suspected carcinogen, and other known carcinogens like benzene, lead, and benzo(a)anthracene. Plaintiffs also emphasize that the Ohio EPA found "unacceptable" amounts of benzene – a known carcinogen – coming from the Clyde plant. (Doc. 23 at ¶156).

Viewed in the light most favorable to plaintiffs, the complaint alleges Whirlpool has for many decades polluted the land and air surrounding the Clyde plant. Plaintiffs allege Whirlpool dumped hazardous, carcinogenic waste at over a dozen sites in southeastern Sandusky County, and that government testing of the soil confirmed the presence of benzene, lead, PCBs, and other toxic substances. Moreover, air samples from the Clyde plant itself showed that Whirlpool released "unacceptable levels" of benzene and other hazardous materials as recently as 2009 and 2010.

13

Furthermore, the complaint alleges plaintiffs were exposed to these substances through airborne emissions, their proximity to the Clyde plant one or more dump sites, and, in one case, a plaintiff's visits to Whirlpool Park.

Accepting these allegations as true, which I must at this stage of the litigation, *Carrier Corp.*, 673 F.3d at 441-442, I find plaintiffs have adequately shown Whirlpool breached its duty of care. Whirlpool's arguments to the contrary lack merit.

First, in arguing there is no basis to infer Whirlpool emitted benzaldehyde, defendant's ignore plaintiffs' allegation that benzaldehyde "is used in Whirlpool's core manufacturing process." (Doc. 23 at ¶166). Although plaintiffs make that allegation on "belief and suspicion" (*id.*), I consider the allegation well-pled – especially given the related allegation that Whirlpool refuses to define its core manufacturing process. *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) ("allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge").

Second, Whirlpool's argument that plaintiffs "acknowledg[e] that Whirlpool does not use benzaldehyde in its core manufacturing process" (Doc. 33-1 at 13) misrepresents what the complaint actually says.

Plaintiffs have acknowledged Whirlpool's *claim* that it does not use benzaldehyde (Doc. 23 at ¶166), but they dispute the truth of that claim. Simply informing me of Whirlpool's position was not an acknowledgment or admission that Whirlpool does not use or emit benzaldehyde. *Cf. Gale v. Hyde Park Bank*, 384 F.3d 451, 452 (7th Cir. 2004) ("That the bank said [it was not at fault] in email messages that [plaintiff] attached to the complaint does not amount to a concession [by

plaintiff that bank was not at fault]; the plaintiff may tell the court what his adversary has said without throwing in the towel.").[3]

Third, Whirlpool's contention that plaintiffs' allegations of airborne pollution are implausible depends entirely on my accepting Whirlpool's exhibits for the truth of the matters asserted therein. Because I may not use the exhibits to decide disputed facts, Whirlpool's argument fails. *Carrier Corp.*, *supra*, 673 F.3d at 441-442; *In re Cardinal Health*, *supra*, 426 F. Supp. 2d at 713.

Fourth, plaintiffs' allegations concerning dumping in the Clyde area are hardly "nonspecific." (Doc. 33-1 at 15). The complaint identifies seven dumping grounds, provides a time-frame within which the dumping occurred, and sets forth the results of EPA's soil and water testing. These allegations support a plausible inference that Whirlpool breached its duty of care by dumping toxic waste at those sites, thereby exposing plaintiffs to those materials.

## 2. Proximate Cause

### a. Claims for Wrongful Death and Personal Injury

Whirlpool also contends plaintiffs do not plausibly allege that its dumping and emitting practices proximately caused plaintiffs' injuries.

Whirlpool argues: 1) only one plaintiff alleges she visited – and was personally exposed to – the toxic waste at Whirlpool Park; 2) the levels of benzaldehyde documented in the Vanilla Report are far below current EPA RSLs for residential soil; 3) plaintiffs' own exhibits contradict their

---

[3] In questioning the plausibility of plaintiffs' allegations that benzaldehyde is hazardous to human health, Whirlpool again relies, impermissibly, on government reports neither referred nor attached to the complaint. Whether, in fact, benzaldehyde is a known or suspected carcinogen is an issue for summary judgment, not a motion to dismiss.

allegations that benzaldehyde and teflon are known or suspected carcinogens; and 4) the complaint does not allege Whirlpool emitted VOCs at a level posing a danger to human health.

In response, plaintiffs contend that, by virtue of living in Clyde and the surrounding environs, they were exposed to Whirlpool's airborne emissions, which included many known or suspected carcinogens. They argue the complaint adequately alleges their exposure to those substances caused they or their children to develop cancer, disabilities, and other diseases.

Plaintiffs also suggest that Whirlpool, in relying exclusively on cases decided at the summary judgment stage,[4] is essentially demanding plaintiffs to provide more detailed factual allegations than Rule 8 and even *Iqbal* and *Twombley* require.

Viewed in the light most favorable to plaintiffs, the complaint alleges a plausible causal relationship between Whirlpool's alleged negligence and plaintiffs' injuries. In brief, plaintiffs have alleged that Whirlpool polluted the air and soil in and around Clyde over a period of at least fifty years.

During that time, Whirlpool dumped carcinogens and other hazardous materials at multiple sites throughout the Clyde area – a practice that "allowed many . . . pollutants . . . to blow through the wind . . . onto the citizens of Clyde and Eastern Sandusky County." (Doc. 23 at ¶140). Moreover, the complaint alleges the soil surrounding the Clyde plant contained PCBs – a class of known carcinogens – at levels exceeding the relevant EPA safety threshold. Although only one plaintiff alleges she visited a dump sites – Whirlpool Park, where high levels of PCBs were found as recently

---

[4] Although plaintiffs accurately characterize the cases cited by Whirlpool, it is worth mention that the decision in *Martin v. Behr Dayton Thermal Prod., LLC*, 2009 WL 8403651 (S.D. Ohio), does not, contrary to plaintiffs' representation, shed any light on the type of allegations sufficient to allege proximate cause in a toxic tort case.

as 2012 – the complaint adequately alleges a mechanism that could expose plaintiffs and others to Whirlpool's hazardous waste.

Furthermore, plaintiffs provide non-conclusory allegations that Whirlpool's airborne emissions exposed plaintiffs to carcinogens, VOCs, and other toxic substances. Significantly, plaintiffs allege the Ohio EPA determined Whirlpool emitted "unacceptable levels" of benzene – a known carcinogen – and other chemicals from the Clyde plant in 2009 and 2010. (*Id.* at ¶158). In addition, plaintiffs allege Whirlpool emitted abnormally high levels of VOCs in 2005, after it switched to a new type of paint.

As a result of their exposure to those substances, plaintiff allege they or their children developed cancers, disabilities, and other diseases. Regarding the incidence of cancer, multiple government agencies have confirmed the existence of a cancer cluster in southeast Sandusky County, and one study identified only a low probability that the cluster could be explained by chance alone.

Whirlpool's chief response to these allegations is that plaintiffs have not pled, with sufficient particularity, that the emitted and dumped materials can cause plaintiffs' injuries (general causation) and in fact caused those injuries (specific injuries).

Whirlpool has cited no authority to support its argument that a plaintiff must allege general and specific causation with the degree of specificity it urges.

For example, Whirlpool contends that *Baker v. Chevron U.S.A., Inc.*, 533 F. App'x 509 (6th Cir. 2013), and *Pinares v. United Techs. Corp.*, 2011 WL 240522 (S.D. Fla.), stand for the proposition that a bare allegation that "there are chemicals present in the environment and children

17

are more susceptible to harm from toxins is insufficient to plead general or specific causation." (Doc. 43 at 12). However, neither case so holds.

First, in *Baker* the court held plaintiffs could not survive a summary judgment motion because the only *proof* of causation they offered did not include individualized exposure data. *Baker*, *supra*, 533 F. App'x at 525. The Sixth Circuit emphasized that "the mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiff's symptoms[.]" *Id.* Thus, the case is about proving, rather than pleading, proximate cause.

Second, the complaint in *Pinares* was devoid of any allegations showing "a causal relationship between any actions by Defendant and Plaintiffs' claimed damages." 2011 WL 240522, *2. In contrast, plaintiffs' complaint here alleges a direct causal link between Whirlpool's dumping and emitting practices and the childhood cancer spike, other plaintiffs' other cancers, and the personal injury claims.

Here, plaintiffs plausibly allege general and specific causation. They do so by plausibly alleging Whirlpool either emitted into the air, or released into the ground, numerous known or suspected carcinogens (benzene, PCBs, VOCs, and benzaldehyde). The plausible inference from these allegations is that one or more of those chemicals, either singly or in reaction with others, can, as a general matter, cause cancer. Moreover, they plausibly allege a mechanism – airborne emissions from the Clyde plant, and airborne transmission from the dump sites – that exposed plaintiffs individually to those cancer-causing substances. No further detail is required at this stage of the litigation.

18

Because plaintiffs have alleged a plausible negligence claim, I will deny the motion to dismiss as to counts one and two.

### b. Claim for Property Damages

Plaintiffs' eleventh claim alleges Whirlpool's negligent disposal of its manufacturing waste caused "a significant loss of property values and stigma to the plaintiffs' property." (Doc. 23 at ¶271).

Whirlpool argues I should dismiss this claim because: 1) Ohio law does not permit damages for diminished property values caused by environmental stigma; and 2) plaintiffs plead no facts showing actual property damage.

Having examined the relevant provisions of Ohio law, I conclude Whirlpool's characterization is correct. "[P]ure environmental stigma, defined as when the value of real property decreases due solely to public perception or fear of contamination from a neighboring property, does not constitute compensable damages." *Ramirez v. Akzo*, 153 Ohio App. 3d 115, 119 (2003). Damages are available only if there is "actual, physical damage to a plaintiff's property." *Id.*; *accord Younglove Constr., LLC v. PSD Dev., LLC*, 782 F. Supp. 2d 457, 462 (N.D. Ohio 2011).

Accordingly, even if plaintiffs had adequately pled that fear of contamination caused a loss in their property values, plaintiffs could not recover damages for such lost property values.

Furthermore, I agree that plaintiffs provided nothing but conclusions to support their property-damages claim. Nowhere does the complaint specify the type of damage to plaintiffs' varied properties or the extent of such damages. Nor do plaintiffs explain, except by pointing to the non-compensable environmental stigma, what caused the alleged drop in property values.

Because plaintiffs' negligence claim for property damages is nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, *supra*, 556 U.S. at 678, I will dismiss claim eleven with prejudice.

### C. Strict Liability and Ultra-Hazardous Activity

In counts three, four, twelve, and thirteen, plaintiffs bring claims for strict liability and ultra-hazardous activity. Counts three and four seek damages for wrongful death and personal injuries, while counts twelve and thirteen seek damages for lost property values.

As relevant here plaintiffs allege: 1) Whirlpool's "manufacturing process, including the disposal of VOCs [and] chemicals, were ultra-hazardous activities"; and 2) Whirlpool "dispos[ed] of chemicals in a dangerous way so as to kill plaintiffs' children[.]" (Doc. 23 at ¶¶221, 227).

### 1. Claim for Property Damage

I dismiss the property damage claims because, as noted in the preceding section, Ohio law does not permit damages for environmental stigma. In addition, plaintiffs provide only conclusory allegations to support their property-damages claim.

### 2. Personal Injury Claims

Whirlpool argues I should also dismiss claims three and four because plaintiffs have not adequately alleged its manufacturing process is abnormally dangerous. It also contends that certain allegations in the complaint – namely, that Whirlpool's smoke-stack system lacked regenerative thermal oxidizers and was too short to ensure airborne pollutants did not fall onto the city of Clyde – suggest that its chemical-disposal process can be made safer, and is thus not ultra-hazardous.

Plaintiffs respond that their allegations are similar to those in *Boggs v. Landmark 4, LLC*, 2013 WL 944776 (N.D. Ohio), which the court held were sufficient to state an ultra-hazardous activity claim against a hydraulic-fracturing operator.

To plead a strict liability claim, plaintiffs must allege that Whirlpool "carries on an abnormally dangerous activity," and plaintiffs suffered "harm . . . resulting from that activity." Restatement (Second) of Torts, § 519 (1977). An activity is abnormally dangerous if it "cannot be maintained without injury to property, no matter what care is taken." *State ex rel. R.T.G., Inc. v. State*, 98 Ohio St. 3d 1, 13 (2002).

Here, however, plaintiffs allege only that Whirlpool disposes of chemicals in a "dangerous way," and that its manufacturing process is "ultra-hazardous." (Doc. 23 at ¶¶221, 227). Plaintiffs allege no facts supporting either of those conclusions; the complaint is silent as to why these activities are ultra-hazardous.

To be sure, the complaint alleges Whirlpool's manufacturing process generates – and thus precipitates a need safely to dispose of – hazardous and carcinogenic materials. However, plaintiffs fail to allege that Whirlpool could not, under any circumstances, dispose of those substances safely. Indeed, the complaint implies Whirlpool could have made the process safe by taking additional steps to ensure that no airborne pollutants fell on Clyde.

Moreover, plaintiffs' reliance on *Boggs* is misplaced.

In *Boggs*, the Hon. Donald C. Nugent of this District held that plaintiffs plausibly alleged hydraulic fracturing, or fracking, was an ultra-hazardous activity. *Boggs*, *supra*, 2013 WL 944776, *2. The court emphasized that fracking "requires the injection of hazardous chemicals and materials into the ground near water sources" – thus supporting an inference that, absent even the utmost care

and attention, fracking would cause property damage. *Id.* Judge Nugent also noted in *Boggs* that fracking was a novel technique that was far less common than transporting hazardous chemicals by rail, which courts do not treat as an ultra-hazardous activity.

Because the complaint here lacks allegations comparable to those in *Boggs*, that case provides no basis for allowing plaintiffs to proceed with their claims for strict liability and ultra-hazardous activity. Accordingly, I will dismiss claims three and four with prejudice.

### D. Trespass

In their fifth and fourteenth claims, plaintiffs allege a trespass; in count five they seek damages for wrongful death and personal injury, and in count fourteen, property damages.[5]

Plaintiffs allege that Whirlpool's "manufacturing process, including the disposal of chemicals, constituted a trespass on plaintiffs' property and to those similarly situated to plaintiffs." (Doc. 23 at ¶233). Plaintiffs also allege that "[b]arrels of liquid Teflon were recently found on the Weiker property in the Green Creek bed." (*Id.* at 152).[6]

Under Ohio law, the elements of a trespass claim: 1) an unauthorized, intentional act; and 2) a physical entry or intrusion on another's land. *Lally v. BP Prods. N. Am., Inc.*, 615 F. Supp. 2d 654, 659-660 (N.D. Ohio 2009).

"Traditionally, an intrusion on property by airborne particulates was actionable under a nuisance claim but did not constitute a trespass." *Williams v. Oeder*, 103 Ohio App. 3d 333, 338 (1995). However, many courts, including courts in Ohio, now recognize that "an invasion of

---

[5] I dismiss claim fourteen, to the extent it seeks damages for environmental stigma, because, as noted *supra*, such damages are non-compensable under Ohio law. In any event, plaintiffs' other allegations of property damage are purely conclusory.

[6] Nine of the plaintiffs are members of the Weiker family.

airborne particulates may interfere with a complainant's interest in exclusive possession [of her property] and may therefore constitute a trespass." *Id.*

In a typical trespass case, any tangible invasion of an owner's property would warrant damages. *Id.* at 339. But "such a rule is not appropriate where the incursion is the result of airborne particulates." *Id.* Rather, Ohio courts require plaintiffs alleging a trespass by airborne pollutants establish they incurred "substantial damage."

Whirlpool argues I should dismiss the trespass claim because plaintiffs have not alleged: 1) its dumping and emitting practices contaminated their property; 2) the levels of benzaldehyde found in six homes in the Clyde area caused substantial damage; and 3) any plaintiff had a possessory interest in his or her property when the alleged trespass occurred.

Plaintiffs respond I should allow the trespass claim to proceed because: 1) emissions from the Clyde plant in 2009 and 2010 contained excessive levels of benzene and other toxic substances; 2) there was a spike of VOC emissions resulting from Whirlpool's difficulties with non-adhering paint; and 3) the Vanilla Report concluded benzaldehyde blankets Clyde.

### 1. Property Damage

To state a plausible trespass claim, plaintiffs must allege that Whirlpool's dumping and/or emitting practices contaminated or substantially damaged their properties. *Cf. Pinares v. United Tech. Corp.*, 2011 WL 240522 (S.D. Fla.) (dismissing trespass claim because, while plaintiffs "make some allegations suggesting that some parts of the Acreage may be contaminated, [those] allegations fall short of actually alleging contamination" on plaintiffs' property).

As Whirlpool accurately observes, the complaint contains no such plausible allegations. The most plaintiffs allege is that, according to the Vanilla Report, benzaldehyde blankets the City of

Clyde. But as I noted above, *see* p. 3, *supra*, the Report says no such thing; it merely detected the presence of benzaldehyde in the attics of six homes. The Report is silent, moreover, on the risks to human health from those amounts of benzaldehyde. Plaintiffs also do not allege the benzaldehyde in the six home caused substantial damage.

Furthermore, to the extent the trespass claim depends on the toxic substances dumped at the various dumping sites, the claim would still be implausible, given plaintiffs' failure to allege those substances: 1) migrated from the dumping grounds to their properties; and 2) the presence, if any, of those substances on their property resulted in substantial damage.

Because the complaint contains no plausible allegations that Whirlpool's emissions or dumping practices substantially damaged plaintiffs' properties, I will dismiss the trespass claims.[7]

### 2. Lack of Possessory Interests

"To recover on a claim of trespass, a plaintiff must prove that he or she had actual or constructive possession of the land at the time the trespass occurred." *Abraham v. BP Exploration & Oil, Inc.*, 149 Ohio App. 3d 471, 475 (2002).

Whirlpool's motion to dismiss noted "[p]laintiffs never allege facts showing that they possessed their properties at the time of the alleged trespass," (Doc. 33-1 at 24). Plaintiffs fail to respond to this argument. Furthermore, my review of the complaint establishes that no plaintiff

---

[7] In a conclusory statement unaccompanied by a citation to the complaint, plaintiffs argue they have adequately pled a continuing trespass, which occurs "when the defendant's tortious activity is ongoing, perpetually creating fresh violations of the plaintiff's property rights." *Weir v. East Ohio Gas Co.*, 2003-Ohio-1229, ¶18 (Ohio App.). However, as will be discussed in more detail below, there are no allegations in the complaint that Whirlpool continues to engage in tortious dumping and polluting practices.

alleges his or her possession of the properties at the time of the trespasses. This, too, provides a basis to dismiss the trespass claim. *Abraham*, *supra*, 149 Ohio App. 3d at 475.[8]

### E. Continuing Nuisance

In their sixth and fifteenth claims for relief, plaintiffs allege "Whirlpool's manufacturing process, including the disposal of chemicals, constituted a continuing nuisance on plaintiffs' property[.]" (Doc. 23 at ¶239).[9]

A nuisance "is defined as the wrongful invasion of a legal right," such as the right to use and enjoy one's property. *Kramer v. Angel's Path, LLC*, 174 Ohio App. 3d 359, 366 (2007).

Under Ohio law, nuisances are either public or private. *Id.* A public nuisance is an unreasonable interference with a right common to the general public. A private nuisance, in contrast, is a "nontrespassory invasion of another's interest in the private use and enjoyment of land." *Id.* at 367.

A nuisance may be continuing or permanent. A continuing nuisance "arises when the wrongdoer's tortious conduct is ongoing, perpetually generating new violations." *Id.* at 367. "Conversely, a permanent nuisance occurs when the wrongdoer's tortious act has been completed, but the plaintiff continues to experience injury in the absence of any further activity." *Id.*

---

[8] Plaintiffs allege they discovered a barrel of Teflon on the Weiker property. Although there are nine Weikers, residing on multiple, unidentified plaintiffs, the complaint does not identify the property on which the teflon was allegedly found. Accordingly, besides the reasons already given for dismissing the trespass claim, this allegation is too vague to state a plausible claim.

[9] I dismiss claim sixteen, which alleges a continuing nuisance that caused property damages, for the reasons given above with respect to plaintiffs' negligence, strict liability, ultra-hazardous activity, and trespass claims.

Finally, Ohio law further classifies nuisances as either "absolute" or "qualified." An absolute nuisance is "based on either intentional conduct or an abnormally dangerous condition that cannot be maintained without injury or property." *State ex rel. R.T.G.*, *supra*, 98 Ohio St. 3d at 13. A qualified nuisance is a lawful act "so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." *Kramer v. Angel's Path, LLC*, 174 Ohio App. 3d 359, 368 (Ohio App. 2007).

Whirlpool argues the complaint fails to allege a plausible continuing-nuisance claim. It contends: 1) plaintiffs' allegations concern only Whirlpool's past dumping and emitting practices, rather than ongoing tortious activity; and 2) plaintiffs fail to allege their damages are "related to the use of" their land, as required to state a nuisance claim. *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St. 3d 210, 216 (2010).

Plaintiffs' opposition papers do not address Whirlpool's grounds for dismissing the nuisance claim. Instead, relying on a federal court's interpretation of Ohio law that the Ohio Supreme Court later rejected, plaintiffs argue that "when a complaint contains a simple allegation that a defendant leaked pollution into the air and water, and that has harmed the plaintiff and his/her land, the plaintiff has properly pled a cause of action for nuisance[.]" (Doc. 40 at 29) (citing *Nieman v. NLO, Inc.*, 108 F.3d 1546 (6th Cir. 1997).

Having considered plaintiffs' claim in light of Ohio's nuisance law, I find that plaintiffs have not plausible alleged a continuing nuisance for at least two reasons.

### 1. Ongoing Tortious Conduct

First, a continuing nuisance claim cannot go forward without allegations that a defendant is engaged in ongoing tortious activity.

26

Plaintiffs' complaint is devoid of any such allegations. Instead, the complaint focuses on dumping practices that Whirlpool ceased before plaintiffs filed their complaint. For example, the allegations about Whirlpool's emissions of combusted paint involve practices occurring from 2005 to 2008. (Doc. 23 at ¶¶52-55). The complaint does not allege Whirlpool's current emissions practices constitute negligence, trespass, or the like.

Finally, plaintiffs do not allege Whirlpool continues to dump toxic sludge at the various dump sites discussed in the complaint. Finally, plaintiffs allege Whirlpool sold Whirlpool Park – the site of high PCB levels – meaning that Whirlpool no longer controls that property.

Plaintiffs' opposition depends entirely on the Sixth Circuit's decision in *Nieman*, *supra*. In that case, the Sixth Circuit concluded that, under Ohio law, a plaintiff could support a continuing-trespass claim with proof of ongoing injury (rather than proof of ongoing tortious conduct). *Id.* at 1557-1558. Relying on *Nieman*, plaintiffs appear to suggest their continuing nuisance claim is adequate, given the continuing injuries that Whirlpool's conduct caused them.

The Ohio Supreme Court repudiated *Nieman* in *Sexton v. Mason*, 117 Ohio St. 3d 275, 283 (2008), calling *Nieman* "an inaccurate characterization of Ohio law." Accordingly, even accepting plaintiffs' allegations that they continue to experience ongoing injuries, that is insufficient to state a continuing nuisance claim.

### 2. Damages Related to the Use of Property

Second, plaintiffs have not plausibly alleged the damages they experienced – i.e., the wrongful deaths of their decedents and their various personal injuries – are "related to the use of the property." *Banford*, *supra*, 126 Ohio St. 3d at 216.

27

Plaintiffs' allegations that Whirlpool's manufacturing process "killed their children" are purely conclusory. Furthermore, plaintiffs nowhere allege how those injuries are related to their use of their property. As far as the complaint shows, these injuries flow from the plaintiffs' common exposure to Whirlpool's dumping and emissions practices, rather than from plaintiffs' use of their property.

For both of these reasons, I dismiss plaintiffs' continuing nuisance claim with prejudice

### F. Reckless Conduct

In counts seven and eight, plaintiffs allege Whirlpool's conduct in disposing of hazardous waste and emitting certain pollutants was reckless, and that Whirlpool's recklessness proximately caused plaintiffs' injuries.

Ohio law does not recognize a stand-alone cause of action for recklessness. "Willful, wanton, and reckless conduct is technically not a separate cause of action, but a level of intent which negates certain defenses which might be available in an ordinary negligence action." *Cincinnati Ins. Co. v. Oancea*, 2004 WL 1810347, *3 (Ohio App.); *see also Griggy v. Cuyahoga Falls*, 2006-Ohio-252, ¶8 (Ohio App.) (same).

Because there is no cause of action for recklessness under Ohio law, I will dismiss claims seven and eight with prejudice. *Bradley v. City of Cleveland*, 2013 WL 775106, *3 (N.D. Ohio).

### G. Fraud

In counts nine and ten, plaintiffs assert fraud claims against Whirlpool. They allege Whirlpool falsely: 1) represented that it did not know of PCBs and other chemicals in the soil at Whirlpool Park; and 2) denied using benzaldehyde in its core manufacturing process. (Doc. 23 at ¶¶149, 255, 264).

Plaintiffs also invoke the fraud-by-omission theory by alleging Whirlpool emitted "pollution into the air that was not revealed to the Ohio EPA and others," in violation of its duty to disclose that information. (*Id.* at ¶255).

Whirlpool responds that the fraud claims are deficient for four reasons: 1) the complaint does not identify the speaker of the statement; 2) plaintiffs do not specify when or where the statements were made; 3) there is no basis for inferring Whirlpool knew the statements were false, or made the statements with intent to mislead plaintiffs; and 4) plaintiffs' allegations of justifiable reliance are too conclusory.

As to the fraud-by-omission claim, Whirlpool argues plaintiffs have not pled facts showing Whirlpool had a duty to disclose information about the allegedly excessive emission of pollutants.

Plaintiffs respond that they have pled their fraud claims with the requisite particularity. They argue: 1) the Whirlpool corporation itself is the speaker; 2) the false statements were made in late 2012 and early 2013; and 3) the complaint alleges plausible, particularized reliance.

To state a fraud claim, plaintiffs must allege: 1) a representation or, if a duty to disclose exists, concealment of a fact; 2) material to the transaction at hand; 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent to mislead another into relying on the representation; 5) justifiable reliance on the representation or concealment, and 6) a resulting injury proximately caused by the reliance. *Burr v. Bd. of Cnty. Comm'rs of Stark Cnty.*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986).

Plaintiffs must plead fraud with particularity. Fed. R. Civ. P. 9(b). Rule 9 requires plaintiffs "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and

where the statements were made; and (4) to explain what made the statements fraudulent." *Republic Bank & Trust Co. v. Bear Stearnes*, 683 F.3d 239, 247 (6th Cir. 2012).

### 1. Fraudulent Misrepresentations

#### a. The Speaker

As Whirlpool accurately observes, the complaint does not identify the speaker of the two misrepresentations.

In their opposition papers, plaintiffs counter that the Whirlpool corporation itself was the speaker. Plaintiffs rely on the group-published doctrine, which provides in securities-fraud cases that "officers and directors of the corporation are held liable for false statements found in group published documents." *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000).

As the Sixth Circuit has explained, this doctrine "is premised on the assumption that in cases of corporate fraud where the false or misleading information *is conveyed in prospectuses, registration statements, annual reports, press releases, or other group-published information*, it is reasonable to presume that these are the collective actions of the officers." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005) (emphasis added).[10]

Here, I am not persuaded that plaintiffs' reliance on the group published doctrine saves their claim under Rule 9(b). This is not a securities fraud case, and there is no need to decide (as in securities fraud cases) whether a corporate executive may be liable for a fraudulent statement by the

---

[10] The court in *Bridgestone* declined to comment on the validity of the doctrine in the Sixth Circuit.

corporation. Given the gap between securities fraud cases and the case here, it is quite doubtful that the group published doctrine is relevant.

In any event, courts applying the group published doctrine generally limit its applicability to written statements. *Bridgestone*, *supra*, 399 F.3d at 689. When one corporate executive's oral statement is the basis of a fraud claim, moreover, there can be "no inference that an oral statement of one officer represents the collective action of others[.]" *In re SmarTalk*, *supra*, 124 F. Supp. 2d at 545.

Because the complaint contains no plausible, particularized allegation that Whirlpool's misrepresentations were made in writing, the group published doctrine – even if generally applicable outside of securities-fraud cases – is inapplicable here. Thus, plaintiffs' fraud claim does not survive Rule 9(b).

### b. Time and Place of Misrepresentations

Furthermore, the complaint does not allege with particularity when or where Whirlpool made the false statements. *Republic Bank & Trust Co.*, *supra*, 683 F.3d at 247.

In the complaint itself, plaintiffs provide no information as to when Whirlpool represented that: 1) it did not know of the pollution at Whirlpool park; and 2) benzaldehyde is not part of its core manufacturing process.

Citing ¶264 of the complaint, plaintiffs assert they pled "Whirlpool made the statements after the PCBs were found on its property and Plaintiffs disclosed the discovery of Benzaldehyde." (Doc. 40 at 33). However, the complaint contains no such allegation, and it is hornbook law that "a complaint cannot be amended by briefs in opposition to a motion to dismiss." *Dana Ltd. v. Aon Consulting, Inc.*, --- F. Supp. 2d ----, 2013 WL 6154397, *9 n.2 (N.D. Ohio).

In any event, the Ohio EPA issued its report identifying PCBs at Whirlpool Park on September 28, 2012, and the Vanilla Report, which documents benzaldehyde in some houses in Clyde, relies on data compiled in early March, 2013. Plaintiffs then filed their second amended complaint on August 2, 2013. Thus, there is a timespan of between five and eleven months in which the statements could have been made.

In the absence of greater particularity of when and where Whirlpool made the alleged misrepresentations, plaintiffs' claim is insufficient under Rule 9(b). *U.S. ex rel. Mariar v. BWXT Y-12, LLC*, 525 F.3d 439, 447 (6th Cir. 2008) (affirming dismissal of claim under False Claims Act because, *inter alia*, plaintiff "has not provided dates on which the purportedly false certifications were submitted, nor has she alleged who submitted [such] certifications").

### c. Reliance

To plead reasonable reliance, plaintiffs must allege facts showing "the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the statement." *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 113 Ohio App. 3d 647, 657 (1996).

In response to defendant's motion, plaintiffs argue they adequately alleged justifiable reliance on Whirlpool's misrepresentations. According to plaintiffs, "the dumping of toxic chemicals in a park where people frequent and children play is material to the decision [*sic*] of those people to use the park. Had Plaintiffs had that knowledge they would not have used the park." (Doc. 40 at 32).

32

This argument is unpersuasive for at least two reasons. First, the complaint does not contain those allegations, and raising new factual allegations in opposition to a motion to dismiss is improper. *Dana*, *supra*, --- F. Supp. 2d ----, 2013 WL 6154397, *9 n.2.

More to the point, even if plaintiffs' argument had a factual basis in the complaint, such allegations would be insufficient, as a matter of law, to show reliance. As already noted, Whirlpool did not make the misrepresentations on which plaintiffs allegedly relied until sometime after September 28, 2012 – when Whirlpool denied knowing of PCB contamination at Whirlpool park), and after March 4, 2013 (when the Vanilla Report data was assembled).

But plaintiffs allegedly contracted their various illnesses, and some plaintiffs' decedents died, well before either of the allegedly fraudulent misrepresentations could have been made. Likewise, Whirlpool sold the land formerly known as Whirlpool Park before the false statements were made.

Accordingly, as a matter of law, plaintiffs could not have relied on Whirlpool's statements in 2012 and 2013. Because plaintiffs have not pled reliance with plausibility or particularity, I must dismiss the fraud claims.

### 2. Fraud by Omission

Plaintiffs' fraud by omission claim fares no better. They allege that Whirlpool emitted pollutants in greater quantities than those reported to the Ohio EPA and others.

Where, as here, a plaintiff alleges fraud by concealment or omission, the plaintiff "must also allege an underlying duty to speak for the nondisclosure to be actionable." *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 822 (N.D. Ohio 2006). Indeed, even in cases involving the release of hazardous chemicals, "failure to warn of potential contamination or exposure to dangerous

33

chemicals, without more, is not actionable as fraudulent concealment." *Boggs*, *supra*, 2012 WL 3485288, *6.

In considering whether a complaint adequately alleges a duty to disclose, I examine allegations regarding:

> 1) the relationship or situation giving rise to the duty to speak; 2) the event or events triggering the duty to speak and/or the general time period when the relationship arose and fraudulent conduct occurred; 3) the general content of the information withheld and its materiality; 4) the identity of those breaching the duty to disclose; 5) what the defendant gained by withholding information; 6) why plaintiff's reliance on the omission was both reasonable and detrimental; and 7) damages proximately flowing from the reliance.

*Randleman*, *supra*, 465 F. Supp. 2d at 822.

To support the fraud-by-omission claim, plaintiffs allege only that Whirlpool "owed duties to [plaintiffs] to operate its manufacturing process, including the disposal of chemicals, in such a manner that it would not cause injury to plaintiffs[.]" (Doc. 23 at ¶254).

However, plaintiffs do not allege Whirlpool had a duty to disclose information about its polluting levels or the contamination at Whirlpool park. Nor do the allegations in the complaint support such a duty. In addition, plaintiffs do not allege what information Whirlpool concealed from them, and they do not allege how reliance on Whirlpool's supposed silence proximately caused their injuries.[11]

For these reasons, I will dismiss plaintiffs' fraud-by-omission claim.

### H. Loss of Consortium

---

[11] Plaintiffs' failure to allege when and how Whirlpool's concealment took place only exacerbates the problems with the complaint's already threabare allegations.

34

In count sixteen, plaintiffs bring a claim for loss of consortium. They argue that, as a result of Whirlpool's conduct, "the spouses and children of many of the Cancer Survivors and those similarly situated have lost the normal marital and filial consortium." (Doc. 23 at ¶285).

Under Ohio law, loss of consortium is a "separate and distinct cause of action[.]" *Bowen v. Kil-Kare, Inc.*, 63 Ohio St. 3d 84, 92 (1992). However, the claim is a derivative one, "dependent upon the defendants having committed a legally cognizable tort upon the spouse [or child] who suffers bodily injury." *Id.* at 93.

As stated above, plaintiffs have pled plausible negligence claims against Whirlpool for its emitting and dumping practices. For that reason, plaintiffs may also pursue a loss-of-consortium claim for Whirlpool's negligence.

However, because I am dismissing the remainder of plaintiffs' claims, they may not purse a loss-of-consortium claim for any of those claims.

## I. Punitive Damages

In their seventeenth claim, plaintiffs allege that, because Whirlpool "demonstrate[d] a conscious disregard for the rights and safety of plaintiffs and the rest of the public," Whirlpool must pay punitive damages. (Doc. 23 at ¶286).

Ohio does not recognize a stand-alone cause of action for punitive damage. *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 331, 650 (1994) ("no civil action may be maintained simply for punitive damages"). Rather, "a plaintiff must be awarded some measure of compensatory damages to receive punitive damages." *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St. 3d 486, 489 (2009).

Given this precedent, I dismiss claim seventeen with prejudice. Doing so does not preclude plaintiffs from recovering punitive damages should they prove their negligence claims and introduce

evidence warranting punitive damages. O.R.C. § 2315(C) (award of punitive damages requires evidence of defendant's "malice or aggravated or egregious fraud").

## J. Class Action

Plaintiffs wish to pursue their property-damage claims in a class action. They ask me to certify a class of all similarly-situated "residents of Sandusky County who have lost their property values because of the tortious conduct by Whirlpool described above." (Doc. 23 at ¶287).

However, I have already determined that plaintiffs' property-damage claims – i.e., their claims for negligence, trespass, continuing nuisance, and strict liability/ultra-hazardous activity – are legally deficient. Accordingly, because no plaintiff has stated a plausible property-damage claim, the plaintiffs cannot pursue such claims on a class-wide basis. The request for class certifications is therefore denied.

## K. Request for Leave to Amend

Plaintiffs also request that, if I grant the motion to dismiss in any respect, I should allow them to amend the relevant sections of their complaint. Whirlpool opposes the request, noting, *inter alia*, this is plaintiffs' second amended complaint, and a conclusory request for leave to amend is inappropriate.

A party seeking leave to amend must file a motion stating its grounds for amending the complaint with particularity. *Evans v. Pearson Enter.*, 434 F.3d 839, 853 (6th Cir. 2006). A "bare request [for leave] in an opposition to a motion to dismiss – without any indication of the particular grounds on which amendment is sought" does not constitute such a motion. *La. Sch. Employees' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010).

36

I decline to predetermine, in the absence of a proper motion and proposed complaint, whether leave to amend should be given. That decision must await the filing, if any, of an appropriate motion and proposed amended complaint.

### Conclusion

For the reasons set forth above, it is

ORDERED THAT:

1.     Plaintiffs' motion to strike (Doc. 42) be, and the same hereby is denied;

2.     Defendant's motion to dismiss (Doc. 33) be, and the same hereby is denied with regard to counts 1 and 2 and plaintiffs' ability to seek recovery for loss of consortium with respect to counts 1 and 2; and

3.     Defendant's motion to dismiss be, and the same hereby is otherwise granted as stated herein.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge